THE HONORABLE RICHARD A. JONES

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON AT SEATTLE

H.N., BY AND THROUGH HER PARENTS
AND GUARDIANS, JOHN DOE AND JANE
DOE; AND JOHN DOE AND JANE DOE,
HUSBAND AND WIFE, ON THEIR OWN
BEHALF ,

            Plaintiffs,

    v.

REGENCE BLUESHIELD, A WASHINGTON
CORPORATION; AND MBA GROUP
INSURANCE TRUST HEALTH AND
WELFARE PLAN ,

            Defendants.

CASE NO. 15-CV-1374 RAJ

ORDER

## I.    INTRODUCTION

This matter comes before the Court on Defendants' Motion for Judgment on the Administrative Record. Dkt. # 25.[1] Plaintiffs oppose the Motion. Dkt. # 37.

In their lawsuit, Plaintiffs seek to recover benefits under a health care plan governed by the Employment Retirement Security Act of 1974 (ERISA) and

---

[1] The Court strongly disfavors footnoted legal citations. Footnoted citations serve as an end-run around page limits and formatting requirements dictated by the Local Rules. *See* Local Rules W.D. Wash. LCR 7(e). Moreover, several courts have observed that "citations are highly relevant in a legal brief" and including them in footnotes "makes brief-reading difficult." *Wichansky v. Zowine*, No. CV-13-01208-PHX-DGC, 2014 WL 289924, at *1 (D. Ariz. Jan. 24, 2014). The Court strongly discourages the Parties from footnoting their legal citations in any future submissions. *See Kano v. Nat'l Consumer Co-op Bank*, 22 F.3d 899-900 (9th Cir. 1994).

administered by Regence BlueShield ("Regence").  Dkt. # 1 (Complaint).  Plaintiffs also seek to enjoin Regence from denying certain claims in the future based on a specific set of clinical guidelines.  *Id.*  Regence denies that the claimed services were medically necessary.  Dkt. # 25.

## II.   PROCEDURAL ISSUES

Before turning to the merits of the parties' arguments, the Court must determine whether it is appropriate to resolve this case on Defendants' motion for judgment under Rule 52 as opposed to summary judgment under Rule 56.  The answer depends on what standard of review the Court applies.  *See Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 109 (1989) ("ERISA does not set out the appropriate standard of review for actions under § 1132(a)(1)(B) challenging benefit eligibility determinations.").  The parties here have simplified the matter by agreeing that the Court should review Regence's denial of coverage *de novo*.  Dkt. ## 25 at pp. 18-19; 37 at p. 27.  The Court accepts the parties' agreement and reviews the record *de novo*.  *See Rorabaugh v. Cont'l Cas. Co.*, 321 F. App'x 708, 709 (9th Cir. 2009) (unpublished) (court may accept parties' stipulation to *de novo* review).

Where review is under the *de novo* standard, the Ninth Circuit has not definitively stated the appropriate vehicle for resolution of an ERISA benefits claim.  The *de novo* standard requires the Court to make findings of fact and weigh the evidence.  *See Walker v. Am. Home Shield Long Term Disability Plan*, 180 F.3d 1065, 1069 (9th Cir. 1999) (*de novo* review applies to plan administrator's factual findings as well as plan interpretation).  Typically, a request to reach judgment prior to trial would be made under a Rule 56 motion for summary judgment, however under such a motion the Court is forbidden to make factual findings or weigh evidence.  *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987).  Instead, the parties here propose that the Court essentially conduct a bench trial on the administrative record under Rule 52.

This procedure is outlined in *Kearney v. Standard Ins. Co.*, 175 F.3d 1084, 1095 (9th Cir. 1999) (noting that "the district court may try the case on the record that the administrator had before it"). In a trial on the administrative record:

> The district judge will be asking a different question as he reads the evidence, not whether there is a genuine issue of material fact, but instead whether [the plaintiff] is disabled within the terms of the policy. In a trial on the record, but not on summary judgment, the judge can evaluate the persuasiveness of conflicting testimony and decide which is more likely true.

*Id*. Thus, when applying the *de novo* standard in an ERISA benefits case, a trial on the administrative record, which permits the Court to make factual findings, evaluate credibility, and weigh evidence, appears to be the appropriate proceeding to resolve the dispute. *See Casey v. Uddeholm Corp.*, 32 F.3d 1094, 1099 (7th Cir. 1994) (on *de novo* review of an ERISA benefits claim, the "appropriate proceeding[] . . . is a bench trial and not the disposition of a summary judgment motion"); *Lee v. Kaiser Found. Health Plan Long Term Disability Plan*, 812 F. Supp. 2d 1027, 1032 n.2 (N.D. Cal. 2011) ("*De novo* review on ERISA benefits claims is typically conducted as a bench trial under Rule 52"); *but see Orndorf v. Paul Revere Life Ins. Co.*, 404 F.3d 510, 517 (1st Cir. 2005) ("When there is no dispute over plan interpretation, the use of summary judgment . . . is proper regardless of whether our review of the ERISA decision maker's decision is *de novo* or deferential.").

Given the above law and the consensus among the parties, the Court elects to resolve the parties' dispute on the administrative record rather than on summary judgment. Therefore, the Court issues the following findings and conclusions, pursuant to Rule 52.

### III.    FINDINGS OF FACT

1.    Plaintiff H.N., who suffers from severe depression, is covered under the MBA Group Insurance Trust Health and Welfare Plan ("Plan").  The Plan and Plaintiffs'

claims herein are governed by the Employee Retirement Income Security Act (ERISA), 29 U.S.C. §1001 *et seq*. Regence is the claims administrator under the Plan. Plaintiffs have asserted claims for benefits under 29 U.S.C. § 1132(a)(1)(B) and for injunctive relief under 29 U.S.C. § 1132(a)(2) and (3), relating to Regence's denial of their claims for reimbursement for certain services rendered to H.N. Plaintiffs also seek attorneys' fees and costs incurred pursuant to 29 U.S.C. § 1132(g)(1). Dkt. # 1 (Complaint).

2.     H.N.'s parents noticed her depression at the end of 2012 and into the beginning of 2013. REG 1068. In January of 2013, H.N.'s mother found her curled up on the bathroom floor in a state of agitation. *Id*. In April, H.N. told her mother that she wanted to kill herself. REG 952. In response, H.N.'s mother took her to the hospital where she remained for about ten days. *Id*. While in the hospital, H.N. told the staff that she felt like three people, and that two of the three voices were pushing her to kill herself. REG 1037.

3.     After she was discharged, H.N. engaged in self-harming behavior. She began cutting herself with increasing frequency and depth. She attempted to overdose on antihistamines. She tried to drink bleach and nail polish remover; in both instances, she was stopped when her father physically restrained her. REG 952-953, 1765. H.N. declined dramatically; at some point her parents decided that she could not be trusted to sleep on her own. REG 953. On some nights, H.N.'s parents would coax her into sleeping in their room, on other nights her mother would share H.N's bed while her father slept on the floor inside the room to ensure H.N. did not harm herself. *Id*. On June 4, 2013, H.N. cut her thigh deep enough to require stitches. REG 953. That day, she was admitted to Seattle Children's Hospital ("Children's") for her self-harming behaviors and remained in the Inpatient Psychiatric Unit until June 13, 2013. REG 2245. Regence covered this period of care.

4.      On June 13, 2013, H.N.'s treating psychiatrist at Children's, Dr. Avanti Bergquist, determined that it was appropriate to discharge H.N. to either a residential treatment facility or an evidence-based outpatient therapy. Dr. Bergquist stated in H.N.'s discharge summary that H.N.'s "thoughts of suicide resolved while in the hospital. However, [her] prognosis remains guarded at this time due to the severity of her symptoms as well as her history of depression and suicidality." REG 2245. To be sure, a few days before being discharged, H.N. had stated that she just wanted to be happy but felt like she wanted to die. REG 1066. Nonetheless, Dr. Bergquist noted upon discharge that H.N. could be "expected to improve with engagement in residential treatment or in an evidence based outpatient therapy such as Dialectical Behavior Therapy [DBT], as well as medication adherence, and maintenance of a safe environment that minimizes the risk of self harm." REG 2245.

5.      H.N.'s own treating physician, Dr. Robert McConaughy, believed that Children's would have discharged H.N. whether or not her suicidal ideations had resolved. REG 1765. This is because Children's uses a cognitive therapy approach, which Dr. McConaughy believed to be ill-suited to a "patient with a complex diagnosis like" H.N. *Id.* Moreover, Dr. McConaughy explained that there were no residential treatment centers for adolescents in Washington, and no DBT treatment was available on such short notice. *Id.* Dr. McConaughy visited H.N. at Children's and evaluated her state at discharge, ultimately recommending that she check into the Menninger Clinic ("Menninger"), an inpatient psychiatric hospital in Houston, Texas. REG 1767. Dr. McConaughy's recommendation was not based solely on the lack of treatment centers in Washington but rather included his assessment of the dangerousness of H.N.'s condition. *Id.* Dr. McConaughy specifically noted that when visiting H.N. at Children's, he found that H.N. "was not stable. [H.N.] was suicidal. [H.N.] had acted on suicidal urges. [H.N.], even

1   while at Children's, voiced an ongoing intention to carry out suicide. At the time

2   of discharge [H.N.] was gravely ill, and was at significant risk of suicide." REG

3   1766.

4   6.    H.N.'s outpatient therapist, Caron Harrang, also recommended that H.N. proceed

5         to Menninger after her discharge from Children's. REG 413. Ms. Harrang based

6         her recommendation on H.N.'s condition at Children's and upon discharge from

7         the same, the treatment options available, taking into consideration the lack of

8         residential options in Washington, and the continuing significant risk of suicide.

9         *Id*. Ms. Harrang noted that there were no other programs in the western United

10        States that compared to Menninger. *Id*. In fact, a residential option would "have

11        very little experience in assessing and treating" patients who "are as seriously

12        emotionally ill as" H.N. was at the time of her discharge from Children's. REG

13        947.

14  7.    Elizabeth Newlin, the attending physician at Menninger, found that H.N. required

15        the treatment offered at Menninger. REG 910-20. Dr. Newlin based her

16        assessment, in part, on her view that H.N. remained a threat to herself after leaving

17        Children's and that a Residential Treatment Center (RTC) was not an appropriate

18        solution. "An RTC simply does not provide a level of professional supervision

19        and care that would have been sufficient to ensure [H.N.]'s safety." REG 915.[2]

20        This is consistent with Dr. McConaughy's statement that "[s]eriously ill patients

21        like [H.N.] can sometimes be *eventually* treated at an RTC, but only *after* extended

22        treatment at a place like Menninger." REG 902 (emphasis in original).

23  8.    Dr. Newlin explained that the staff at Menninger was specially trained in

24        psychiatric nursing and were able to "evaluate a patient's mental and emotional

25

26  _____

    [2] The Court notes Defendants' concern that Dr. Newlin "can hardly be expected to argue that H.N.'s
    treatment [at Menninger] was not medically necessary." Dkt. # 46, at pp. 3-4. Of course, this kind of biased
27  argument could be raised on behalf of Regence's medical reviewers as well. The Court has considered the bias of
    each of the doctors and reviewers and finds that, on the record submitted, Dr. Newlin is a credible witness.

condition.  They can often detect subtle indications that a patient's condition may be deteriorating."  REG 916.  While at Menninger, H.N. was monitored 24 hours per day with frequent status checks occurring at least once every 30 minutes.  *Id.*

9.  Regence denied coverage for H.N.'s treatment at Menninger from June 16 to July 26, 2013 because it found that the treatment was not medically necessary.  REG 357-58.

10. Regence defined "Medically Necessary or Medical Necessity" as
    Health care services or supplies that a Physician or other
    health care Provider, exercising prudent clinical judgment,
    would provide a patient for the purpose of preventing,
    evaluating, diagnosing or treating an illness, Injury, disease or
    its symptoms, and that are:

    •  in accordance with generally accepted standards of
    medical practice;

    •  clinically appropriate, in terms of type, frequency, extent,
    site and duration, and considered effective for the patient's
    Illness, Injury or disease; and

    •  not primarily for the convenience of the patient, Physician
    or other health care Provider, and not more costly than an
    alternative service or sequence of services or supply at least
    as likely to produce equivalent therapeutic or diagnostic
    results as to the diagnosis or treatment of that patient's
    Illness, Injury or disease.

    For these purposes, "generally accepted standards of medical
    practice" means standards that are based on credible
    Scientific Evidence published in Peer-Reviewed Medical
    Literature generally recognized by the relevant medical
    community, Physician Specialty Society recommendations
    and the views of Physicians and other health care Providers
    practicing in relevant clinical areas and any other relevant
    factors.

REG 149.

11. On June 18, 2013, psychiatrist Marvin Rosen, M.D, reviewed H.N.'s records at Menninger on behalf of Regence.  REG 185-90.  Dr. Rosen noted H.N.'s diagnosis as depression with psychosis and the current precipitating event as "[h]aving issues of sleep, superficial cutting."  *Id.*  In evaluating the medical necessity of H.N.'s admission to Menninger immediately following her discharge as an inpatient at Children's, Dr. Rosen noted that she was "stable at discharge from Seattle Children's.  She would have been appropriate for referral to a Residential Placement.  The family elected to admit her to this out of state psychiatric inpatient facility."  *Id.*  Dr. Rosen found that the "Patient does not meet any of the Milliman Care Guidelines [MCG] for re-admission to MHIP [mental health inpatient] for a child or adolescent."  *Id.*

12. The MCG are evidence-based clinical guidelines.  Regence utilized the 17th Edition of the MCG when reviewing H.N.'s claims.  This edition includes guidelines for inpatient behavioral health treatment levels of care and residential acute behavioral health treatment levels of care.  There is no guideline for non-acute residential treatment levels of care.  REG 3770.

13. The MCG might be a helpful tool but were not intended to operate as a sole basis for denying treatment or payment.  The MCG are to be applied to individual patients on a case-by-case basis and always in the context of a qualified healthcare professional's clinical judgment.  REG 3775.

14. Though the MCG are recognized by physicians and hospitals, they are "by no means the sole measure of medical necessity."  REG 918.  Regence's benefits plan does not require satisfaction of the MCG in order to find medical necessity.  Instead, Regence requires evidence of "accepted standards of medical practice" for a finding of medical necessity, but nowhere in its plan does Regence conflate "accepted standards of medical practice" with the MCG.  Nonetheless, Regence

stated that the MCG criteria were "required" when it denied coverage to H.N. *See*, *e.g.*, REG 1889.

15. Besides H.N.'s treating physicians, other physicians disagree about the utility of using "mechanistic, cookie-cutter" guidelines such as the MCG. REG 942. Physicians tend to agree that "[d]etermining what treatment is medically necessary for a patient is matter of professional judgment." REG 941. This is congruent with Regence's requirement that medical necessity be within certain accepted standards of medical practice.

16. H.N.'s treating physicians found that her time at Menninger from June 16 to July 26, 2013, was medically necessary. REG 903, 919, 947. With regard to the MCG, her physicians agreed that H.N.'s condition necessitated care at the inpatient level. REG 1780. Additionally, her physicians found that Menninger satisfied the MCG criteria for inpatient care. REG 919. Specifically, Dr. Newlin noted that for each group of eight patients, Menninger assigns an attending psychologist, two therapists, two social workers, four registered nurses, and additional aides and technicians. REG 916. "This is in addition to the two psychiatrists who are assigned to each patient." *Id*.

17. In a December 30, 2013 level one appeal review, psychiatrist Diane Stein, M.D., upheld the denial of coverage on the grounds that H.N. met the MCG criteria for the lower residential treatment level of care, which was available in an in-network facility, and therefore H.N.'s inpatient admission was not medically necessary because she could have been effectively treated in the less-costly residential setting. REG 2053-54.

18. On September 8, 2014, Dr. Paul Hartman, an independent reviewer, reviewed the medical evidence and determined that H.N.'s inpatient treatment at Menninger was not medically necessary. REG 1872. His analysis was based on the MCG. REG 1870-73.

19. Dr. Hartman commented that "[r]esidential treatment was available in Oregon for the member at the time of discharge from Seattle Children's Hospital." REG 1872. H.N.'s mother researched this option, as well as the RTCs in Utah, finding that each RTC cost about $15,150 to $27,000 per month and required stays of at least one to four months. REG 956. There is no indication in the record that these RTCs had openings or would have accepted H.N. Moreover, H.N.'s treating physicians disagreed that a RTC was the correct level of care considering H.N.'s severe condition.

20. In a subsequent external review, dated April 15, 2015, a second independent reviewer again determined that the inpatient level of care was not medically necessary:

> The patient has no history of attending an intensive outpatient program or partial hospitalization program. Therefore, a lower level of care would have been sufficient in this case during the time period June 16, 2013 through July 26, 2013. During this period of time, the Claimant normally performed activities of daily living without signs of severe psychiatric symptoms including severe anger manifestations.

REG 3061.

21. When questioned about her mental state during the June 2013 to July 2013 period, H.N. stated that if "functioning [adequately] mean[s] . . . breathing[, then] yeah, okay I was breathing. I was not going to school; I was in bed all day. My mom made all my meals. She gave me all my medicine. I just sat there. I didn't do anything except stare at the T.V. all day and self-harm." REG 2164. She said that she had not completed homework in months. *Id.* H.N. conceded that the around-the-clock care at Menninger in June 2013 was necessary because she "was constantly thinking about self-harm. It was [her] number one thing to go to." REG 2165.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27

22.     Menninger discharged H.N. on July 26, 2013 and she returned to Seattle to attend a new school.  REG 955.  H.N. slid back into self-harming habits in the fall of 2013.  REG 955-956.  H.N.'s parents felt that they could not leave H.N. alone for more than a few minutes without H.N. attempting suicide.  *Id*.  On one occasion, H.N.'s mother needed to leave for an appointment and arranged for H.N.'s father to return home to watch H.N.  REG 956.  In the few minutes between H.N.'s mother leaving and her father returning, H.N. had managed to "cut from arms to ankles" and was lying on the bathroom floor looking "quite pale" with a note in her hand that said, "People say you can't run from your problems.  Watch me." REG 956.

23.     In September 2013, H.N. attempted suicide by first overdosing on Tylenol and then attempted to hang herself.  REG 269.

24.     When questioned about the fall of 2013, H.N. said that she was researching more effective ways to attempt suicide.  For example, when she had access to medications—whether her parents' or her sister's prescriptions—she would research their lethal dosages or lethal combinations.  REG 2167.  When H.N.'s parents assumed she was using her phone to communicate with friends, H.N. was actually researching ways to kill herself.  *Id*.  On October 31, 2013, H.N. planned her suicide and wrote a two page letter to her friends and family.  REG 959-60.  On November 1, 2013, H.N.'s mother left for a few minutes to walk the dog across the street and returned to find H.N. with an electrical cord wrapped around her neck.  REG 956.  Later, H.N.'s sister inadvertently found the suicide note.  REG 269.

25.     H.N.'s parents brought her back to Menninger on November 4, 2013.  REG 956.  H.N.'s treating physician, Dr. McConaughy, appealed to Regence regarding this admission.  REG 539-40.  He told Regence that H.N. met the MCG criteria for admittance to Menninger.  REG 540.  In his clinical judgment, "no other course of

1
2

treatment will provide the care necessary to protect [H.N.] from herself at this critical time." *Id*.

3
4
5
6
7
8

26.    On November 7, H.N. "reported urges to hang herself with a bed sheet" and a hanger.  REG 270, 282.  In a November 7, 2013 Treatment Record, Dr. Newlin stated that H.N.'s "[p]arents wish to have her home but if she is to have any chance at safe return home, she will first need to have symptoms stabilized and triggers more clearly outlined and develop consistent means of coping in our context as well as home."  REG 282.

9
10

27.    On November 13, H.N. had a "volatile family session . . . within the context of a previous serious suicide attempt."  REG 270.

11
12
13
14
15
16
17
18
19
20

28.    That same day, H.N.'s team at Menninger began "exploring the risks vs. potential benefits of continuing with the recommendation of outpatient treatment given she has not participated in an evidence-supported, structured intensive outpatient DBT [dialectical behavioral therapy] program which is our current recommendation." REG 269.  On November 14, 2013, Dr. Newlin wrote that H.N. was excited at the prospect of discontinuing the one-on-one monitoring at Menninger.  REG 267. Dr. Newlin wrote that this close monitoring would be discontinued because the "patient has established safety."  *Id*.  However, H.N. was still under a "sharps" restriction, which meant that "constant 1:1 monitoring was still required at any time when H.N. was allowed to have sharp objects in her possession."  REG 929.

21
22
23
24
25
26
27

29.    On November 18, 2013, Dr. Newlin recorded that the team was contemplating the decision whether to place H.N. in lower-intensity IOP treatment or the higher-intensity RTC treatment (both of which are a step-down from inpatient care), with the choice between these options "to be determined by ideal healing environment." REG 290.  In that same note, Dr. Newlin recorded H.N.'s mood as still "quite fragile."  REG 289.

30.  On November 19, 2013, the team social worker contacted two dialectical behavioral therapy (DBT) IOPs in Seattle and was "waiting on callbacks." REG 287.

31.  Regence covered H.N.'s Menninger stay from November 4 to November 19, 2013, finding this period of care to be medically necessary. REG 270. After having the opportunity to review additional medical records, reviewers found that Menninger's treatment was medically necessary from December 7 to December 21, 2013. REG 3064.

32.  Regence denied coverage for H.N.'s treatment at Menninger from November 20 to December 6, 2013 and from December 22 to December 26, 2013. The denial was based, in part, on reviewers' understanding that H.N.'s team appeared to have approved her for decreased levels of care at a RTC and because H.N. was granted "passes" to leave Menninger campus for visits with her parents. REG 270, 271, 1872, 3010, 3064, 3070. Menninger, however, was always considering lower levels of care for its patients because its goal was to make each patient well enough to return home. REG 935. "The fact that [Menninger was] considering a lower level of care does not mean that a lower level of care was medically appropriate for [H.N.] at any time before Dec. 26, 2013." *Id*. (internal quotations omitted).

33.  H.N. is noted as saying that, prior to December 26, 2013, she felt "fabulous." REG 267. H.N.'s treating physicians explained that H.N. was prone to act in "pretend mode" in which she employed techniques to hide her suicidality. REG 269, 1332. During an interview, H.N. explained that because she wanted to kill herself, and because she knew that others wanted to stop her, she would attempt to earn the trust of her caretakers so that they would leave her alone, which would allow her to freely attempt suicide. REG 2167. H.N. admitted to thinking about suicide "all the time" at Menninger, and she conceded that if she were to have

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27

been discharged closer to November 19, she would have had an easier time attempting suicide because her parents would have a false sense of security with regard to H.N.'s mental state.  REG 2169.

34.   At discharge on December 26, 2013, the team at Menninger did not recommend that H.N. return home.  REG 933.  Instead, the team decided that H.N. needed to transfer directly to a RTC.  *Id*.  Specifically, H.N. was transferred to New Haven in Utah.

35.   New Haven is licensed to provide residential treatment to adolescents aged 12 to 18.  REG 3450.  New Haven provides the residents with school courses, experiential therapy, community building, and group activities.  REG 3452-55.

36.   New Haven is a non-acute RTC.  REG 3447.  A non-acute RTC typically treats patients for a longer duration and has less emphasis on constant safety monitoring than an acute facility.  *Id.*  "Peer-reviewed scientific studies have shown that for patients with persistent behavioral disorders that have not responded to outpatient therapy, long-term non-acute RTCs provide highly effective treatment."  *Id*.  The industry standards for non-acute RTCs differ from those of acute RTCs.  *Id*. Moreover, for patients with complex diagnoses and persistent symptoms, such as H.N., New Haven provides a program resulting in very little recidivism.  "Where acute RTCs have a 75% recidivism rate, more than 90% of New Haven's clients never go back to long-term care again."  *Id*.

37.   H.N.'s policy did not limit residential care to "acute" residential care.  REG 22. Instead, the policy defined "Residential Care" as "care received in an organized program which is provided by a residential facility, Hospital, or other facility licensed, for the particular level of care for which reimbursement is being sought, by the state in which the treatment is provided."  *Id*.

38.   The MCG, however, only account for residential acute levels of treatment.  *See, e.g.*, REG 3770.  With that said, the MCG cite to an article describing the different

levels of care for children and adolescents, including the residential treatment level. REG 3793. The article states that residential treatment typically lasts from six months to several years. *Id.* "A school program may be on the RTC grounds, or the child may be transported out to a separate therapeutic school or prevocational program." REG 3796.

39. On January 2, 2014, Dr. Rosen reviewed the claim for coverage for New Haven. He noted that New Haven is a "long term therapeutic boarding school/residential facility," which provided Regence with very little clinical information on which to base a coverage determination. REG 3416. Dr. Rosen determined that, based on the limited information available, Regence could not determine that H.N. met the medical necessity criteria for admission to a RTC. *Id.* Much of Dr. Rosen's analysis turned on the MCG factors for acute residential treatment. REG 3417.

40. In a July 7, 2014 review, Dr. Diane Stein noted that the medical necessity of H.N.'s stay at New Haven was not established because at that stage "there [was] no clinical information on which to base a medical necessity determination." REG 4403. On January 16, 2015, Dr. Ali conducted an independent review of H.N.'s treatment at New Haven to determine whether it was medically necessary. Dr. Ali determined that the MCG criteria were not met and H.N. could have been treated at a lower level of care, such as a partial hospitalization program ("PHP"). REG 3914. A subsequent independent review on March 19, 2015 was conducted that again upheld the denial. The review found that H.N.:

> [D]id not demonstrate a life-threatening and ability to receive adequate care from caregivers, was able to perform activities of daily living, did not have severe psychiatric symptoms, and her symptoms appear to have stabilized. . . . She did not appear to be at risk of imminent danger to herself or others. She did not require regular one-on-one supervision, and when one-on-one supervision was instated, no acute inpatient treatment was required.

REG 4929. The reviewer further noted that,

> During this period of time, she was consistently not suicidal, homicidal, and she was neither disturbed in thinking or behavior. . . she could have been treated at a less restrictive, less intrusive level of care such as a partial hospitalization program.  She had no evidence of psychotic symptoms.

*Id.*

41.   H.N.'s treating physicians, including those from Menninger and New Haven, all agreed that the residential program at New Haven was medically necessary.  REG 3456-79, 3847-49.

42.   The Court had the opportunity to review records from H.N.'s treating physicians, Regence's reviewing physicians, and independent reviewing physicians.  The Court finds H.N.'s treating physicians to be credible witnesses who made conclusions based on a full consideration of H.N.'s medical records and analyses of her complex diagnosis.

## IV.     CONCLUSIONS OF LAW

### A.  Standard under ERISA

ERISA provides that a qualifying ERISA plan "participant" may bring a civil action in federal court "to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan[.]"  29 U.S.C. § 1132(a)(1)(B);  *Metro. Life Ins. Co. v. Glenn*, 554 U.S. 105, 108 (2008) (ERISA "permits a person denied benefits under an employee benefit plan to challenge that denial in federal court.").  The Court finds that H.N.'s father is a qualified participant and H.N. is a beneficiary.

As discussed above, ERISA does not set forth the appropriate standard of review for actions challenging benefit eligibility determinations.  *Firestone*, 489 U.S. at 109.  The parties, however, have agreed that *de novo* review is appropriate here.  Dkt. ## 25 at pp. 18-19; 37 at p. 27.  The Court accepts the parties' stipulation and reviews the record *de novo*.  *See Rorabaugh*, 321 F. App'x at 709 (court may accept parties

stipulation to *de novo* review). "When conducting a *de novo* review of the record, the court does not give deference to the claim administrator's decision, but rather determines in the first instance if the claimant has adequately established that he or she is disabled under the terms of the plan." *Muniz v. Amec Constr. Mgmt., Inc.*, 623 F.3d 1290, 1295-96 (9th Cir. 2010). The administrator's "evaluation of the evidence is not accorded any deference or presumption of correctness." *Perryman v Provident Life & Acc. Ins. Co.*, 690 F. Supp. 2d 917, 942 (D. Ariz. 2010). In reviewing the administrative record and other admissible evidence, the Court "evaluates the persuasiveness of each party's case, which necessarily entails making reasonable inferences where appropriate." *Oldoerp v. Wells Fargo & Co. Long Term Disability Plan*, 12 F. Supp. 3d 1237, 1251 (N.D. Cal. 2014) (quoting *Schramm v. CNA Fin. Corp. Insured Grp. Ben. Program,* 718 F. Supp. 2d 1151, 1162 (N.D. Cal. 2010)).

When a district court "reviews a plan administrator's decision under the *de novo* standard of review, the burden of proof is placed on the claimant." *Muniz*, 623 F.3d at 1294; *see also Horton v. Reliance Standard Life Ins. Co.*, 141 F.3d 1038, 1040 (11th Cir. 1998) (the claimant "bears the burden of proving his entitlement to contractual benefits"). However, this does not relieve the plan administrator from its duty to engage in a "meaningful dialogue" with the claimant about his claim. *See Booton v. Lockheed Med. Ben. Plan*, 110 F.3d 1461, 1463 (9th Cir. 1997) ("[W]hat [29 C.F.R. § 2560.503-1(g)] calls for is a meaningful dialogue between ERISA plan administrators and their beneficiaries. . . . [I]f the plan administrators believe that more information is needed to make a reasoned decision, they must ask for it.").

B.  Plaintiffs met their burden to recover benefits.

There is no question that H.N. was covered under Regence's plan. At issue is whether Regence correctly denied H.N.'s claims, which turns on whether Plaintiffs met their burden to show that the three periods of treatment were medically necessary. Dkt. # 25, at pp. 2-3.

The Court made findings of fact based on the underlying administrative record. Based on those findings, the Court holds that Plaintiffs carried their burden to show, by a preponderance of the evidence, that Regence should have covered all three claims—the two Menninger stays and the treatment at New Haven.  Regence's reviewers initially denied these claims and subsequently upheld those denials based on a narrow view of the situation using only the MCG as guideposts.  H.N.'s mental state was complicated, and the physicians who were closely monitoring her were certain that any lower level of care was more likely to result in more suicide attempts.  *See, e.g.*, REG 3837-50 (Dr. McConaughy explaining H.N.'s complex case and why she needed constant monitoring through Menninger and New Haven).  Moreover, H.N.'s physicians gave reasonable and convincing explanations for their disagreement with the conclusions of the physicians at Children's as well as those of Regence's reviewers.

Plaintiffs have shown by a preponderance of the evidence that H.N.'s treatment met the generally accepted standards of medical practice, were clinically appropriate, and yielded superior therapeutic results to lower levels of care.  Dkt. # 25, at p. 3.  H.N. most likely survived her younger teenage years due to her extended treatment at Menninger and New Haven, and a lower level of care may have resulted in a far more dire outcome. Though Regence places the highest value on the MCG, it provides no authority to show that these are only guidelines by which Plaintiffs must prove their right to benefits. Indeed, Plaintiffs provided evidence by several physicians who can attest to the accepted medical standards that were met when deciding on the treatment options for H.N.

C.  Plaintiffs' claim for injunctive relief fails.

Plaintiffs wish to enjoin Regence from denying any further claims for long term residential care based on the MCG related to acute residential care.  Dkt. # 37, at pp. 30-32.  Plaintiffs argue that Regence must cover all residential treatment, including long-term care, and that Regence may not utilize the MCG to deny certain clams.  *Id.* at 30-31.

The Court's findings in this Order are limited to the three instances in which Regence denied H.N. coverage for care at Menninger and New Haven. Based on those findings, the Court holds that Plaintiffs proved that they are due their benefits in those three discrete instances based on the terms of the plan, specifically those terms relating to the medical necessity of H.N.'s treatment at Menninger and New Haven. Plaintiffs did not present sufficient argument or evidence to suggest that Regence had a pervasive practice of summarily denying claims for residential treatment or improperly relying on the MCG beyond the three specific claims in this matter. Therefore, the Plaintiffs' requested injunction is not properly before the Court. The Court therefore DENIES Plaintiffs' request for a permanent injunction.

## V.      CONCLUSION

Having reviewed Defendants' motion, Plaintiffs' response in opposition and Defendants' reply in support thereof, the Court hereby FINDS and ORDERS:

1) Defendants' Motion for Judgment under Federal Rule of Civil Procedure 52 is GRANTED in part and DENIED in part. Dkt. # 25. The Court finds that Plaintiffs met their burden to prove that the treatment rendered at Menninger and New Haven was medically necessary.

2) Plaintiffs' request to strike three specific categories of documents from the record is DENIED. Dkt. # 37, at p. 28.

3) Plaintiffs' request for a permanent injunction is DENIED. Dkt. # 37, at p. 30.

Dated this 23rd day of December, 2016.

The Honorable Richard A. Jones
United States District Judge

ORDER-19